## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EDDIE LESTER**, *et al.*, | : | **CIVIL ACTION NO. 3:01-CV-1182** |
| | : | |
| **Plaintiffs** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **GENE P. PERCUDANI, CHASE** | : | |
| **MANHATTAN MORTGAGE** | : | |
| **CORPORATION, CHAPEL CREEK** | : | |
| **HOMES, INC., RAINTREE** | : | |
| **HOMES, INC., CHAPEL CREEK** | : | |
| **MORTGAGE BANKER, INC.,** | : | |
| **DOMINICK P. STRANIERI, and** | : | |
| **WILLIAM SPANER,** | : | |
| | : | |
| **Defendants** | : | |

------------------------------------------------------------------------

| | | |
|---|---|---|
| **PABLO ACRE**, *et al.*, | : | **CIVIL ACTION NO. 1:04-CV-0832** |
| | : | |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CHASE MANHATTAN MORTGAGE** | : | |
| **CORP., WILLIAM K. SPANER,** | : | |
| **DOMINICK P. STRANIERI, GENE** | : | |
| **PERCUDANI, CHAPEL CREEK** | : | |
| **HOMES, INC., RAINTREE** | : | |
| **HOMES, INC., HOMES BY** | : | |
| **VINTAGE, INC., Y-RENT, INC.,** | : | |
| **and CHAPEL CREEK MORTGAGE** | : | |
| **BANKER, INC.,** | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

Plaintiffs bring the above-captioned cases[1] alleging that defendants perpetrated a pattern of racketeering and mail fraud that caused plaintiffs to purchase homes at inflated prices.  Plaintiffs advance claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968; the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 PA. STAT. ANN. §§ 201-1 to -9.3; and Pennsylvania common law.  Defendants Gene Percudani and the corporate entities he controls (hereinafter "the Percudani defendants")[2] have filed a motion (Civil Action No. 3:01-CV-1182, Doc. 306; Civil Action No. 1:04-CV-0832, Doc. 107) seeking partial summary judgment on the RICO claim against them.  Defendants William Spaner and Chase Manhattan Mortgage Corporation (hereinafter "the Chase defendants") have filed a separate motion (Civil Action No. 3:01-CV-1182, Doc. 360; Civil Action No. 1:04-CV-0832, Doc. 232)[3]

---

[1]These cases have been consolidated for purposes of this memorandum and order.  See FED. R. CIV. P. 42(a).

[2]Percudani's corporations included defendants Chapel Creek Homes, Raintree Homes, Homes by Vintage, Y-Rent, and Chapel Creek Mortgage Banker.

[3]For ease of reference, subsequent citations to the record will refer exclusively to entries docketed in Lester v. Percudani, Civil Action No. 3:01-CV-1182.  For purposes of the pending motions, all documents associated with Acre v. Chase Manhattan Mortgage Corp., Civil Action No. 1:04-CV-0832 are duplicates of those filed in Lester.

2

for summary judgment on the RICO conspiracy claim to which they are subject.

For the reasons that follow, both motions will be denied.[4]

## I.   **Statement of Facts**[5]

Plaintiffs contend that defendant real-estate developer Gene Percudani

("Percudani") orchestrated a scheme to overvalue residential real estate in the

Pocono Mountains, located in Monroe County, Pennsylvania.  He allegedly enticed

plaintiffs into home purchases using fraudulent advertisements broadcast along the

East Coast.  When plaintiffs contacted Percudani, he arranged home sales utilizing

appraisals performed by defendant Dominick Stranieri ("Stranieri") that valued the

homes at inflated rates.  Defendant Chase Manhattan Mortgage Corporation

("Chase") purportedly enabled the scheme by financing mortgages for many

plaintiffs in noncompliance with lending standards applicable to residential

mortgages.  Chase then sold the mortgages on the secondary market, shifting the

risk of default to remote purchasers, while frequently retaining contracts to service

---

[4]Plaintiffs have also filed two motions to strike.  The first motion (Civil Action
No. 3:01-CV-1182, Doc. 355; Civil Action No. 1:04-CV-0832, Doc. 221) seeks to strike
an affidavit (Civil Action No. 3:01-CV-1182, Doc. 348; Civil Action No. 1:04-CV-0832,
Doc. 219) in support of the motion for summary judgment of the Percudani
defendants.  The second motion (Civil Action No. 3:01-CV-1182, Doc. 357; Civil
Action No. 1:04-CV-0832, Doc. 228) seeks to strike the Percudani defendants'
response (Civil Action No. 3:01-CV-1182, Doc. 349; Civil Action No. 1:04-CV-0832,
Doc. 222) to plaintiffs' counterstatement of material facts.  For the reasons
discussed at note 20, infra, the first motion will be denied as moot, and the second
motion will be granted.

[5]In accordance with the standard of review for a motion for summary
judgment, the court will present the facts in the light most favorable to plaintiffs, as
the non-moving parties.  See infra Part II.

the loans.  This scheme allegedly left plaintiffs with mortgages that eclipsed the

market values of their properties, homes in which they owned negative equity, and

monthly payments that they were simply unable to afford.

### A.   The Advertisements and Incentive Programs

Percudani and his former business partner, Gerard Powell ("Powell"),[6]

created the alleged scheme to assist low- and moderate-income individuals in

purchasing homes.  Percudani, through defendants Y-Rent and Raintree Homes,

marketed new residences located in the Pocono Mountains via television, radio, and

direct mailings.  (Doc. 387, Ex. A; Doc. 387, Ex. K at 43.)  Many of these

advertisements targeted the greater New York City metropolitan area, though they

also appeared in various locales along the eastern seaboard.  (Doc. 387, Ex. K at 43.)

The advertisements informed recipients that they could purchase a home for

"$1,000 DOWN [and] $685.00 PER MONTH."  (Doc. 387, Ex. A.)  They also

represented that "From the moment you put your $1,000 down WE WILL PAY

YOUR RENT AT YOUR CURRENT APARTMENT until the day you move into

your new home!" and that "The Only Thing You Have To Lose Is Your Landlord!"

(Id.)  Plaintiffs responded by calling a toll-free telephone number, which directed

them to either defendant Raintree Homes, Inc. ("Raintree") or defendant Chapel

Creek Homes, Inc. ("Chapel Creek"), both of which either built or sold homes

---

[6]Gerard Powell is not a defendant herein.

within Percudani's construction network.  (Doc. 387, Ex. K at 62-64.)  Percudani

controlled both Raintree and Chapel Creek.[7]  (Id. at 34, 62.)

Many homebuyers lacked the financial reserves necessary for a down

payment, and Percudani and Powell worked with non-defendant Gerald Tegethoff

("Tegethoff"), an account executive for Chase,[8] to create a savings opportunity for

buyers with tight budgets.  (Doc. 387, Ex. L at 93; Doc. 387, Ex. N at 153, 158.)  These

discussions produced the Gold Key program and the Silver Key program

(collectively the "Gold Key programs").  (Doc. 309 at 17a.)  The Gold Key programs

functioned as preliminary savings plans into which prospective homebuyers paid

an initial $1,000 deposit[9] and subsequent monthly payments until they accumulated

sufficient funds to cover a down payment.  (Doc. 309 at 17a; Doc. 387, Ex. K at 164.)

---

[7]Raintree was formed when Percudani dissolved its predecessor, Chapel
Creek, which was itself a successor of defendant Homes by Vintage, Inc.  (Doc. 352
¶ 69; Doc. 387, Ex. K at 34.)  Percudani and Gerard Powell owned equal shares in
Chapel Creek with Percudani controlling a fifty-one percent interest for purposes of
voting and corporate governance.  (Doc. 387, Ex. L at 77.)  Percudani eventually
acquired Powell's share in Chapel Creek around 1996 or 1997, dissolved it, and
launched Raintree in its place.  (Doc. 387, Ex. K at 34.)

[8]The record is unclear as to the precise chronology of Tegethoff's
employment.  Initially, Tegethoff worked as a branch manager for American
Residential Mortgage Corporation, which merged with Chase around 1997.  (Doc.
398, Ex. H at 22-23.)  Plaintiffs' filings assert that Tegethoff eventually acted as
executive vice president of Chase, (see, e.g., Doc. 393 at 14), but provide no record
evidence to that effect.  Tegethoff's personal account of his employment history
states that he served as an account executive after the merger.  (Doc. 398, Ex. H at
90.)

[9]The $1,000 down payment referenced in Percudani's marketing materials
equates with the initial payment required for enrollment in the Gold Key programs.
(Doc. 387, Ex. A.)

During the savings period, the Percudani defendants offered buyers monetary incentives up to $700 in monthly rent for one year, with a maximum total incentive of $8,400.  (<u>See</u> Doc. 387, Ex. K at 164; Doc. 387, Ex. L at 72; <u>see also, e.g.</u>, Doc. 385, Exs. 2-5.)  The Percudani defendants regularly supplied documentation regarding the rent-payment incentives to Chase as a component of plaintiffs' mortgage applications.  (Doc. 387, Ex. K at 144-46.)  Employees of the Percudani defendants explained the operation of the Gold Key programs to Chase underwriters on several occasions.  (<u>See, e.g.,</u> Doc. 387, Ex. M at 145; Doc. 387, Ex. P at 46-47, 49.)

Plaintiffs' expert report explains that purchase incentives programs are common in the real estate industry.  The payment of rent, however, is prohibited by industry practice because it casts doubt on a buyer's ability to engage in the savings habits necessary to accumulate assets for a down payment and to meet monthly mortgage obligations.  (<u>See</u> Doc. 387, Ex. D at 9; Doc. 388, Ex. VII; Doc. 388, Ex. X at 122; Doc. 388, Ex. XIV at 96-97.)  According to plaintiffs' expert, Chase's lending guidelines as well as industry lending standards place limits on the amount of purchase incentives.  These limits vary depending upon the value of the home and the amount of the buyer's down payment.  A buyer who is capable of making a down payment of fifteen percent of the purchase price may receive incentives worth six percent of that price.  (Doc. 387, Ex. D at 9; Doc. 388, Ex. XIV at 96-97.)  A buyer

who contributes a down payment in an amount between ten and fifteen percent[10]

may receive incentives of up to three percent of the price.  (Doc. 387, Ex. D at 9;

Doc. 388, Ex. XIV at 96-97.)  The value of a buyer's incentives directly affects the

principal amount of the buyer's mortgage loan.  If a seller wishes to provide

purchase incentives in excess of applicable limits, that excess must be used to

reduce the purchase price of the home and, in turn, to reduce the value of the loan

the buyer will receive.  (Doc. 388, Ex. VII.)  Failure to adhere to these guidelines can

result in a buyer incurring debt service which the buyer is ill-equipped to manage

in light of his or her income level and credit history.  (Doc. 387, Ex. D at 9, 12.)

In the cases *sub judice*, several months typically elapsed between the

prospective homebuyers' enrollment in the Gold Key programs and closing.  (Doc.

309 at 17a.)  During this period, Raintree or Chapel Creek worked with the

homebuyer to build and finance their homes.  (Doc. 387, Ex. K at 107.)  Defendant

Chapel Creek Mortgage Banker, Inc. ("Mortgage Banker") also participated in the

process by compiling the information necessary for mortgage applications, which it

usually placed with Chase.  (Doc. 364 ¶¶ 1, 12; Doc. 376 ¶¶ 1, 12.)

Chase underwriters managed by defendant William Spaner ("Spaner")

processed many of plaintiffs' applications.  Spaner forewarned the underwriters

that plaintiffs' files would differ from those that the underwriters "would normally

---

[10]Plaintiffs' expert report states that the threshold down payment amount triggering a decrease to the three-percent cap is ten percent of the purchase price; testimony from Chase employees indicates that it is fifteen percent.  (<u>Compare</u> Doc. 387, Ex. D at 9, <u>with</u> Doc. 388, Ex. XIV at 96-97.)

see." (Doc. 387, Ex. Q at 175.)  Ordinarily, Chase would have immediately rejected

loan applicants with credit scores like those of the plaintiffs; however, Spaner

instructed Chase underwriters that plaintiffs' evolving credit would qualify them for

the mortgages by the time of closing.  (Id.)  An underwriter supervised by Spaner

candidly testified that Chase's handling of plaintiffs' loan applications was

uncommon and that Chase simply did not process applications of borrowers who

failed to meet threshold lending criteria.  (Id.)

Plaintiffs allege that Chase effectively concealed their inability to repay their

loans by formulating the Gold Key programs and by processing their applications

using relaxed lending standards.  They aver that these actions caused the loans to

appear more stable than they actually were and enabled Chase to resell them on the

secondary market.  (Doc. 387, Ex. D at 1-2; Doc. 388, Ex. XIII at 157.)  Plaintiffs'

monthly payments under the loans exceeded the amounts suggested by Percudani's

advertisements, often by several hundred dollars.  (See generally Doc. 365.)

**B.     Overvalued Appraisals of Plaintiffs' Homes**

Every sale required an appraisal of the home to value the property and

determine the amount of the mortgage. (Doc. 387, Ex. D at 2.)  Stranieri was

retained to perform these appraisals for all but eight of plaintiffs' transactions.

(Doc. 352-7 at 17-21; Doc. 364 ¶ 12; Doc. 376 ¶ 12; Doc. 387, Ex. C.)  Prior to April

1997, Stranieri appeared on Chase's appraiser review list.  (Doc. 388, Ex. XI at 103.)

The review list is a compilation of appraisers who have been placed on

probationary status as a result of poor performance, such as:  (1) incorrectly valuing

8

properties by more than fifteen percent, (2) omitting material information in an appraisal, or (3) committing other serious infractions.  (Doc. 388, Ex. VIII.)  Chase lending guidelines prohibit "listed" appraisers from valuing any property for which the proposed loan amount exceeds $500,000.  In addition, valuations by an appraiser on Chase's review list must be independently verified by a second appraiser.  (Id.) Placement on the review list is the most severe sanction that Chase imposes on appraisers whose performance is substandard.  (Doc. 388, Ex. XI at 111.)

In April 1997, Chase removed Stranieri from its review list without adhering to established removal procedure, which requires independent verification of five consecutive appraisals.[11]  (Doc. 352-7 at 17-21; Doc. 388, Ex. IV; Doc. 388, Ex. XI at 103-04.)  The Chase official who removed Stranieri from the list testified that he did so because it was unclear why Stranieri was placed on review status .  (Doc. 388, Ex. XI at 104.)  Nevertheless, he testified that it is "most unusual" for an appraiser to appear on the list without cause.  (Id. at 106.)  Prior to removing Stranieri from the review list, he attempted to locate Stranieri's performance review file but was unable to find it.  (Id. at 110-11.)  He did not engage in any discussions with his colleagues at Chase prior to reinstating Stranieri to accepted appraiser status.  (Id. at 105.)

---

[11]Stranieri performed approximately ten appraisals for Percudani properties prior to 1997; however, the vast majority of his approximately one hundred appraisals occurred after his removal from Chase's review list.  (See Doc. 352-7 at 17-21.)

After Stranieri's reinstatement, Mortgage Banker nominated him to appraise Percudani homes, and Stranieri subsequently did so for numerous transactions involving Chase financing.  (Doc. 388, Ex. XI at 246.)  Plaintiffs' expert has opined that Stranieri generated appraisals rife with error.  (Doc. 388, Ex. D at 3.)  His appraisals—as well as the few received from other appraisers—regularly exceeded the prevailing market value of similar, non-Percudani homes by between $10 and $80 per square foot.  (Doc. 352-7 at 11-13, 17-20; <u>see also</u> Doc. 387, Ex. C.)  An employee of Mortgage Banker testified that she informed Stranieri on several occasions that the Percudani defendants "needed" a home to appraise at a specified

value.  (Doc. 352-4 at 145.)[12]  Stranieri appraised plaintiffs' homes by reference to

other Percudani properties and to those in communities with higher selling prices.

According to plaintiffs' expert, neither method is an appropriate means of property

valuation.  (Doc. 352-7 at 12; Doc. 387, Ex. D at 3; see also Doc. 388, Ex. V at 1.)  The

appraisals also failed to account for incentives under the Gold Key program and

failed to indicate that Percudani had purchased and resold many of plaintiffs'

properties within a twelve-month period.  (Doc. 387, Ex. D at 3; see also Doc. 352-7

at 12; Doc 388, Ex. VII.)  Chase guidelines and standard industry practice require

that such issues be documented on the appraisal forms.  (Doc. 387, Ex. D at 3; Doc

---

[12]Debbie Trabalka, a Mortgage Banker employee responsible for shepherding the loan-approval process, testified as follows:

Q.   Did you ever tell him, "Dominick [sic] [Stranieri], I said I need 190 and you're at 187.  You've got to get up to 190?
A.   No.
Q.   Did you write "need" and a number every time on every appraisal request form?
A.   I think so.

\* \* \*

Q.   Do you recall occasions where you didn't write it?
A.   Yeah.
Q.   Okay.  The number that you wrote next to the word "need," did that signify what the sales price was going to be?
A.   It was the sales price rounded up.
Q.   Did he ever call you and say, you know, "The value isn't that number?"
A.   Yes.
Q.   Then what would happen.
A.   I would say, "Give me the appraisal at the number you came in at."
Q.   Did you ever say, "No.  You've got to make it that number?"
A.   No.

(Doc. 352-4 at 145-46.)

388, Ex. VII.)  Plaintiffs allege that these flaws enabled Stranieri and Percudani to

support inflated appraisals by reference to prior ones, perpetuating above-market

prices and approving mortgages for plaintiffs that they were unable to afford.[13]

(Doc. 352-7 at 12, 17-20; Doc. 388, Ex. D at 3.)

\_\_\_\_\_These cases presently contain 150 active plaintiffs who were affected by

defendants' allegedly fraudulent scheme to various degrees.  A total of 117 plaintiffs

representing eighty-four transactions purchased homes from a Percudani entity

and obtained financing through Chase using an appraisal performed by Stranieri.

(Doc. 364 ¶ 12; Doc. 376 ¶ 12.)  Refining the participation of specific defendants, the

court notes that Percudani entities acted as both seller and broker of every

mortgage transaction in which plaintiffs participated.  (Doc. 343-2, ¶¶ 10-26, 28-59,

61-86; Doc. 352 ¶¶ 10-26, 28-59, 61-86.)  All save eight appraisals, representing

thirteen plaintiffs, were performed by Stranieri, and approximately eighty-five

percent of plaintiffs' mortgages were financed by Chase.  (Doc. 364 ¶ 10; Doc. 376 ¶

10; Doc 384, Ex. A.; Doc. 387, Ex. P at 205; Doc. 401 ¶ 13.)  Overall, a mere twelve

plaintiffs, representing seven transactions, obtained financing from sources other

---

[13]Several plaintiffs purchased homes via transactions structured as refinance
loans.  (See, e.g., Doc. 343-2 ¶¶ 21, 57, 83; Doc. 352 ¶¶ 21, 57, 83; Doc. 387, Ex. E ¶ 10.)
Each of these plaintiffs received two loans directly from Percudani-controlled
entities during the construction process.  (Doc. 387, Ex. E ¶ 10.)  The first loan was
used to purchase the real property; the second was used to construct the house.
(Id.)  The two loans were then refinanced into a single mortgage upon completion of
construction.  (Id.)  Chase provided many of these refinance loans, all of which
overvalued the properties in amounts consistent with loans based upon Stranieri
appraisals.  (Id. ¶ 11; Doc. 387, Ex. C at 3; Doc. 352-7 at 19.)

than Chase or an entity controlled by Percudani.  (Doc. 364 ¶ 7; Doc. 376 ¶ 7.)  Of

these seven transactions, all but one involved Stranieri as the appraiser.  (Compare

Doc. 364 ¶ 7, with Doc. 364 ¶ 10.)

### C.    **Procedural History**

Plaintiffs commenced the civil action captioned Lester v. Percudani, No.

3:01-CV-1182, on June 28, 2001.  The companion case, captioned Acre v. Chase

Manhattan Mortgage Corp, No. 1:04-CV-0832, followed three years later on April 16,

2004.  The complaints allege RICO and UTPCPL violations against all defendants.

They also assert a claim for breach of fiduciary duty against the Percudani

defendants.  The Percudani defendants and the Chase defendants filed the pending

summary judgment motions, each of which seek dismissal of the RICO claims.  The

motions also request that the court decline to exercise supplemental jurisdiction

over the state-law claims.  The parties have fully briefed the RICO issues, which are

now ripe for disposition.

## II.    **Standard of Review**

Through summary adjudication the court may dispose of those claims that do

not present a "genuine issue as to any material fact," and for which a jury trial

would be an empty and unnecessary formality.  See FED. R. CIV. P. 56(c).  It places

the burden on the non-moving party to come forth with "affirmative evidence,

beyond the allegations of the pleadings," in support of its right to relief.  Pampas v.

City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); see

also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  This evidence must be

adequate, as a matter of law, to sustain a judgment in favor of the non-moving party

on the claims.  See <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-57 (1986);

<u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-89 (1986); <u>see</u>

<u>also</u> FED. R. CIV. P. 56(c), (e).  Only if this threshold is met may the cause of action

proceed.  <u>Pampas</u>, 331 F. Supp. 2d at 315.

## III.    <u>Discussion</u>

RICO implicates a broad array of organized, criminal activity and prohibits

conspiracies to engage in such activity.  See 18 U.S.C. § 1962; <u>Beck v. Prupis</u>, 529

U.S. 494, 496 (2000) (citing Organized Crime Control Act of 1970, Pub. L. No. 91-452,

84 Stat 922, 922-23).  The Act imposes criminal liability for violation of its provisions,

<u>see</u> 18 U.S.C. § 1963, and it authorizes persons injured by racketeering conduct to

enforce RICO prohibitions through private suits for money damages, <u>see</u> <u>id.</u>

§ 1964.[14]

Plaintiffs allege that the Percudani defendants engaged in a mail fraud

scheme as a component of a racketeering enterprise to inflate home prices.

Plaintiffs bring separate RICO conspiracy claims against the Chase defendants,

---

[14]Section 1964 of RICO authorizes private recovery as follows:

Any person injured in his business or property by reason of [prohibited
racketeering conduct] . . . may sue therefor in any appropriate United
States district court and shall recover threefold the damages he
sustains and the cost of the suit, including a reasonable attorney's fee
. . . .

18 U.S.C. § 1964(c).

averring that they furthered the Percudani defendants' RICO enterprise. The Percudani defendants and the Chase defendants have filed separate motions for summary judgment on the RICO claims against them. Stranieri is not affected by either of these motions.

### A.    The RICO Claim against the Percudani Defendants

Section 1962(c) of RICO prohibits "any person . . . associated with any enterprise engaged in . . . interstate or foreign commerce, [from] conduct[ing] or participat[ing], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). To prevail under § 1962(c), a plaintiff must demonstrate: (1) "the existence of an enterprise affecting interstate commerce," (2) "that the defendant was employed by or associated with the enterprise," (3) "that the defendant participated, either directly or indirectly, in the conduct of the affairs of the enterprise," and (4) that the defendant's participation involved a pattern of at least two criminal acts of racketeering, known as "predicate acts." Bailey v. Reed, 29 F. App'x 874, 875 (3d Cir. 2002).

The Percudani defendants' motion raises two distinct arguments rebutting their alleged RICO liability. First, they contend that plaintiffs have failed to proffer evidence that they engaged in conduct that qualifies as a pattern of predicate acts under RICO. (See Doc. 338 at 4-5.) Second, they contend that plaintiffs' evidence is insufficient to permit a reasonable jury to conclude that their actions caused plaintiffs' damages. (See Doc. 309 at 6-8.) The court will address these issues seriatim.

### 1.   __Plaintiffs' Allegations Regarding a Scheme to Defraud__

A RICO violation requires proof that a defendant engaged in a pattern of two or more crimes within the statutorily delineated list of predicate acts.  See 18 U.S.C. § 1961(1).  A plaintiff must prove all elements of the predicate act crimes in addition to the elements enumerated within RICO.  See Warden v. McKelland, 288 F.3d 105, 114 (3d Cir. 2002) (requiring RICO plaintiff to "establish a 'pattern' of . . . predicate acts[] and demonstrate that the scheme caused injury"); Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 521-29 (3d Cir. 1998) (setting aside verdict finding violation of § 1692(c) because plaintiffs failed to prove the defendants engaged in the alleged predicate acts).  The predicate acts must be committed by a racketeering enterprise[15] rather than by disparate and unassociated individuals, and the mere existence of predicate acts, without more, will not establish a RICO enterprise.  United States v. Console, 13 F.3d 641, 650 (3d Cir. 1993).  Rather, an enterprise requires the existence of an independent organization that features a decision-making framework within which constituent parts operate to further the organization's goals.  See United States v. Pelullo, 964 F.2d 193, 211 (3d Cir. 1992) (holding that RICO claims require proof "(1) that the enterprise is an ongoing organization with some sort of framework for making or carrying out decisions; (2) that the various associates function as a continuing unit; and (3) that the enterprise

---

[15]RICO defines an "enterprise" as a factually interrelated association of individuals, organizations, or corporations.  18 U.S.C. § 1961(4).  No formal legal relationship is required.  Id.

be separate and apart from the pattern of activity in which it engages"). Proof of the predicate acts may corroborate the existence of a RICO enterprise, but the plaintiff must nevertheless demonstrate the existence of an enterprise distinct from the acts. Console, 13 F.3d at 650 (citing United States v. Turkette, 452 U.S. 576, 583 (1981)).

In the present case, plaintiffs contend that the Percudani defendants engaged in mail and wire fraud, upon which they rely as the predicate acts for their RICO claim. Mail fraud or wire fraud "consists of (1) a scheme to defraud, (2) use of the mail or interstate wires to further that scheme, and (3) fraudulent intent." See 18 U.S.C. §§ 1341, 1343; United States v. Pharis, 298 F.3d 228, 234 (3d Cir. 2002); Kehr Packages Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1413 (3d Cir. 1991). The mailings or transmissions "must relate to the underlying fraudulent scheme," but they need not be an essential component of it or contain any fraudulent representations. See Kehr Packages, 926 F.2d at 1413-14; Bonavitacola Elec. Contractor, Inc. v. Boro Developers, Inc., 87 F. App'x 227, 231 (3d Cir. 2003). Wholly truthful mailings or transmissions may fall within the ambit of the mail and wire fraud statutes if performed in connection with a scheme to defraud. Kehr Packages, 926 F.2d at 1413-14, 1416 n.3 (observing that truthful mailings that impart a false sense of security to fraud victims constitute mail fraud when sent as a component of an artifice to deceive); Plater-Zyberk v. Abraham, No. Civ. A. 97-3322, 1998 WL 67545, at *6 (E.D. Pa. Feb. 17, 1998). The scheme to defraud, however, must include fraudulent omissions or misrepresentations capable of deceiving

17

individuals of ordinary prudence regardless of whether the deceptive statements appear in the mailings or transmissions upon which the scheme rests.  See Kehr Packages, 926 F.2d at 1415; Walter v. Palisades Collection, LLC, 480 F. Supp. 2d 797, 803 (E.D. Pa. 2007).

Plaintiffs contend that the Percudani defendants transmitted the loan advertisements in furtherance of a scheme to defraud, thereby constituting mail and wire fraud and supplying the predicate acts for a RICO offense.  The Percudani defendants respond that plaintiffs' have failed to allege facts that support the existence of a RICO enterprise distinct from the alleged mail fraud scheme.  (See Doc. 338 at 4-5.)  The court will evaluate plaintiff's evidence to determine whether a reasonable jury could find, first, that the Percudani defendants engaged in mail and wire fraud and, second, that they participated in a RICO enterprise distinct from that activity.

The Percudani defendants enticed plaintiffs through advertisements representing that plaintiffs could purchase a home for a $1,000 down payment and $635 monthly payments thereafter.  That plaintiffs eventually received loans with payment amounts in excess of these representations does not mandate a finding of misrepresentation; however, a jury could consider the consistent disparity between the advertised prices and plaintiffs' actual payments and conclude that the advertisements were misleading.  Moreover, the jury could conclude that they were part of a scheme to defraud.  The Percudani defendants brokered all of plaintiffs mortgage transactions.  They allegedly sold plaintiffs homes in excess of market

value by arranging for inflated appraisals and by granting plaintiffs purchase incentives through the Gold Key programs. As a result, plaintiffs received loans greater than otherwise permitted under applicable Chase guidelines and industry lending standards. Reasonable jurors considering this evidence *in toto* could conclude that the Percudani defendants knowingly engaged in a scheme to defraud and used the mails and wires in furtherance thereof.

A jury could likewise conclude that the Percudani defendants participated in an enterprise independent of the scheme to defraud. Percudani, through corporations he controlled, operated a real estate development business throughout the 1990s. During that period, disparate entities within Percudani's corporate network purchased land, constructed homes, and sold the finished products. (See, e.g., Doc. 387, Ex. K at 62-64.) Raintree operated as realtor for the homes produced by it sister corporations. Mortgage Banker acted as broker for homebuyers' mortgages, arranging appraisals and obtaining financing for many buyers. Several of Percudani's entities engaged in business transactions incident to the construction of residential real estate but unrelated to the loan advertisements and the alleged acts of mail and wire fraud. Hence, a reasonable jury could conclude that the mail and wire fraud scheme was organized within Percudani's corporate network to maximize the profit of a distinct business venture engaged in the development and sale of real estate. The court finds that plaintiffs have satisfied their summary judgment burden to produce evidence that the Percudani

defendants participated in a racketeering enterprise distinct from the mail and wire fraud scheme.

### 2.   Causation of Plaintiffs' Damages

RICO plaintiffs must also demonstrate that their injuries were the direct result of the defendant's predicate acts.  See Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 457 (2006) (quoting Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 497 (1985)) ("The compensable injury flowing from a violation of [§ 1962(c)] 'necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise.'").  A plaintiff cannot attach liability merely by proving that he or she suffered harm from an otherwise legal action of the racketeering enterprise unconnected to the predicate acts.  See V-Tech Svcs., Inc. v. Street, 215 F. App'x 93, 96 (3d Cir. 2007).  Instead, a plaintiff must demonstrate that the predicate acts directly and proximately caused the injury of which the plaintiff complains.[16]  See id. ("[P]roximate cause requires a direct relation between the

---

[16]Three factors govern whether a plaintiff has established the requisite proximate cause for a RICO claim:  (1) whether the plaintiff was directly harmed by the defendant's predicate acts, (2) whether damages are speculative or concrete, and (3) whether alternative potential plaintiffs exist who could better redress the harm alleged.  See Allegheny Gen. Hosp. v. Philip Morris, Inc., 228 F.3d 429, 443 (3d Cir. 2000).  The Percudani defendants' motion for summary judgment addresses only the first factor while the Chase defendants' motion discusses all three.  The court will set forth the applicable law regarding all three factors in its discussion of the Chase defendants' motion.  See infra Part III.B.  As the Percudani defendants have not contested causation based on the second and third factors, the court will not address them at this juncture.

injury claimed and the injurious conduct alleged."); see also Smith v. Berg, 247 F.3d

532, 539 (3d Cir. 2001).

In the instant case, the Percudani defendants contend that the claims of

certain plaintiffs falter on causation grounds because plaintiffs did not receive

services from Stranieri and Chase or because plaintiffs did not enroll in the Gold

Key programs.  Stranieri's lack of involvement in a particular plaintiff's transaction

is not fatal to that plaintiff's suit against the Percudani defendants.  The Percudani

defendants built homes for plaintiffs in six residential developments with over half

of the construction occurring in one subdivision.  (Doc. 352-7 at 17-21.)  Stranieri

performed appraisals for all but eight of plaintiffs' purchases.  (Id.; Doc. 387, Ex. C.)

These appraisals overvalued plaintiffs' properties and omitted calculations

necessary to account for benefits they received under the Gold Key programs.[17]  As Stranieri performed more and more appraisals, overvalued properties became increasingly concentrated within finite geographic areas.  Subsequent appraisals that referenced these properties were artificially high regardless of whether Stranieri prepared the valuations.  The timing of Stranieri's appraisals vis-à-vis those prepared by others strengthens this conclusion.  All but two of the eight non-

---

[17]Plaintiffs allege that defendants reported these incentives improperly on the HUD-1 settlement sheet used for their mortgage closings.  The HUD-1 form is a settlement sheet that discloses various costs paid by the buyer and the seller in a real estate transaction and balances payments by each to produce the net amount that one party owes the other.  (Doc. 387, Ex. D at 9.)  When either buyer or seller pays an amount on the other's behalf, the payment must appear on both sides of the settlement sheet.  (Id.)  This dual reporting ensures that the purchase price reflects both the payee's liabilities and the payor's entitlements.

In the present case, plaintiffs contend that benefits received under the Gold Key programs were not reported in this dual fashion.  The incentive payments appear on the buyer's side of the HUD-1 as payments made on the buyer's behalf but not on the seller's side.  (See, e.g., Doc. 352-8 at 8, 11, 14.)  The effect of this one-sided reporting allegedly caused the payment due to the seller to be greater than it should have been, with the net amount due exceeding the actual amount owed by the value of the Gold Key incentives.  (Doc. 387, Ex. D at 9.)  Hence, the reporting failure resulted in an unbalanced HUD-1 settlement sheet with a discrepancy equal to the benefits of the Gold Key program.

Defendants have supplied an affidavit (Doc. 396) executed by Percudani indicating that the value of this discrepancy was forwarded to a third-party company who administered and paid the Gold Key program benefits during the savings period.  (Id. at 4 ¶ 6.)  Defendants contend that the HUD-1 settlement sheets therefore accurately reflect the transactions.  Regardless of the merits of defendants' contentions, the HUD-1 settlement sheets demonstrate that the purchase incentives received by many plaintiffs exceeded three percent of the value of their homes despite financing in excess of eighty-five percent of the value.  Any such excess allegedly should have been used to decrease the value of the purchase price of the homes.  Accordingly, a reasonable jury could find that the HUD-1 forms reinforce the improper use of purchase incentives regardless of whether they adequately account for the Gold Key benefits.

Stranieri appraisals occurred approximately four years after Stranieri began valuing properties for the Percudani defendants.  Hence, Stranieri and the Percudani defendants had ample opportunity to exert inflationary pressure on the comparable market prior to the utilization of outside appraisals.

Chase's lack of involvement in a particular transaction likewise has no effect on the Percudani defendants' scheme.  The Chase defendants facilitated the inflationary trend in sales prices by providing financing to many plaintiffs who would have been unable to purchase homes absent the Gold Key programs. Chase's aberrant financing practices enabled the Percudani defendants to consummate numerous inflated sales, which, in turn, artificially increased market prices within the geographic locales where plaintiffs purchased their properties.  A reasonable jury could find that the inflated prices affected any plaintiff who purchased a home from the Percudani defendants regardless of whether Chase provided the financing.

That certain plaintiffs' did not participate in the Gold Key programs does not affect the validity of their claims.  The Gold Key programs merely provided a means by which plaintiffs with little savings could accumulate the assets necessary to purchase a home.  The programs had no effect on the alleged joint efforts of Stranieri and the Percudani defendants to augment purchase prices.   Plaintiffs who did not participate in the Gold Key programs were no less harmed by the inflated value of their properties than were their Gold Key co-plaintiffs.  A

reasonable jury could conclude that all plaintiffs received homes in excess of fair

market value regardless of whether they participated in the Gold Key programs.[18]

The Percudani defendants' participation in each of plaintiffs' mortgages

reinforces defendants' ability to perpetrate the alleged mortgage scheme.  The

Percudani defendants brokered the mortgages for all of plaintiffs' homes, placing

them in a position to favor appraisers and lenders who would provide the valuations

and financing necessary to maintain the momentum of the Percudani defendants'

RICO enterprise.  Stranieri and Chase served these roles for a considerable

majority of plaintiffs' transactions.  Moreover, plaintiffs have proffered sufficient

evidence that they suffered similar harm even when Stranieri or Chase did not

participate in a particular transaction.  Hence, a reasonable jury could conclude

that the Percudani defendants engaged in a RICO enterprise with respect to all of

the sales transactions, and their motion for summary judgment will be denied.

### B.    The RICO Conspiracy Claim against the Chase Defendants

RICO also prohibits conspiracies to engage in racketeering activity.  18

U.S.C. § 1962(d).  A plaintiff alleging a RICO conspiracy must prove that the

---

[18]The Percudani defendants also move for summary judgment on the ground that many plaintiffs have refinanced or sold their properties, indicating that plaintiffs suffered no financial injury as a result of the alleged racketeering enterprise.  Plaintiffs have produced contrary evidence specifying the amount by which their properties were overvalued.  (See Doc. 352-7 at 17-22.)  Plaintiffs' ability to sell or refinance may affect *amount* to which they are entitled, but it has no bearing on the Percudani defendants' liability for those damages.  To the extent the Percudani defendants challenge the amount of damages, they present an issue properly preserved for the jury.

defendant co-conspirator (1) knew of the racketeering activity perpetrated by a RICO enterprise and (2) agreed to facilitate the enterprise's actions.  See Smith, 247 F.3d at 535.  The co-conspirator must have intended to further acts that, if completed, would satisfy all elements of a substantive RICO offense.  See id. at 537 n.9; Harry Miller Corp. v. Mancuso Chem. Ltd., 468 F. Supp. 2d 708, 719 (E.D. Pa. 2006) ("[W]ithout a RICO enterprise, the [conspiracy] claim cannot succeed: there can be no knowledge of an agreement to facilitate the enterprise's scheme . . . .").  The conspirator need not actually commit the predicate acts necessary for a substantive RICO infraction.  See Salinas v. United States, 522 U.S. 52, 64 (1997) ("If conspirators have a plan which calls for some conspirators to perpetrate the crime and other to provide support, the supports are as guilty as the perpetrators."); Smith, 247 F.3d 532, 538 (3d Cir. 2001).  Nevertheless, a conspiracy plaintiff must allege direct injury resulting from the predicate acts of the enterprise.  Beck, 529 U.S. at 505 ("[I]njury caused by an overt act that is not an act of racketeering or otherwise wrongful under RICO . . . is not sufficient to give rise to a cause of action . . . for a violation of § 1962(d).").

In the present case, the Chase defendants move for summary judgment solely on proximate causation grounds.  (Doc. 363 at 1.)  Three factors govern whether a plaintiff has demonstrated the proximate causation necessary to a RICO conspiracy claim.  First, the defendant's predicate acts must directly cause the plaintiff's injury.  See Allegheny Gen. Hosp. v. Philip Morris, Inc., 228 F.3d 429, 443 (3d Cir. 2000) (reiterating that victims become increasingly unlikely plaintiffs as they become

more distant from the predicate acts).  A plaintiff is not entitled to recover for injuries solely attributable to third-party conduct or unrelated to suspect RICO transactions.  See id.; Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 271 (1992) ("The general tendency of the law, in regard to damages at least, is not to go beyond the first step." (internal quotations omitted)).  Second, there must be a facile method for the apportionment of damages among numerous injured parties. Allegheny Gen. Hosp., 228 F.3d at 443; Callahan v. A.E.V., Inc., 182 F.3d 237, 261 (3d Cir. 1999).  And damages must be readily discernible, not subject to conjecture or speculation.  Callahan, 182 F.3d at 261 (quoting Holmes, 503 U.S. at 269-70) ("[R]ecognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts.").  Finally, there must be little possibility that other potential plaintiffs exist to vindicate the alleged injury.  Allegheny Gen. Hosp., 228 F.3d at 443; Callahan, 237 F.3d at 261.  Hence, the claim of an indirectly injured plaintiff must yield to that of a direct victim suffering a more easily redressable harm.  Callahan, 237 F.3d at 261 (noting that directly injured individuals generally enforce RICO rights with sufficient frequency to render unnecessary extending the right of action to the more remotely injured).

The first of the causation factors requires plaintiffs to demonstrate that they suffered harm as a direct result of the conspiracy's predicate acts of mail and wire fraud.  As discussed in Part III.A.2, supra, a reasonable jury could conclude that the allegedly inflated property values were directly caused by the Percudani

26

defendants' mail fraud scheme.  The jury could also find that Chase conspired to

produce this outcome by providing financing opportunities that would have

ordinarily been inaccessible to plaintiffs.  Chase underwriters testified that

mortgage applications from individuals with plaintiffs' credit ratings were routinely

rejected early in the lending process.  Despite this standard practice, Chase

processed plaintiffs' applications.  Chase used appraisals executed by Stranieri,

who was previously on its review list, to justify financing to plaintiffs.  A Chase

official inexplicably removed Stranieri from the list without conferring with his

colleagues who had authority to place appraisers on review status.  A reasonable

jury could infer from this testimony that Chase improperly removed Stranieri from

the list, facilitating his role in the conspiracy.[19]  Chase also enabled many plaintiffs to purchase homes through the Gold Key programs despite its direct knowledge that the programs improperly fronted plaintiffs' rent payments.

Reasonable jurors could conclude that Chase's lending practices facilitated a scheme by the Percudani defendants to artificially increase home prices.  The jury could conclude that Chase's financing of approximately eighty-five percent of plaintiffs' transactions provided Percudani with the leverage necessary to exert inflationary pressure on market prices.  Accordingly, plaintiffs have satisfied their

---

[19]The Chase defendants also attack proximate cause on the ground that plaintiffs' harm is attributable to their voluntary act of entering the mortgage transactions.  The Chase defendants rely on several cases holding that a business that competes with an entity engaged in racketeering activity has no RICO claim against the entity for loss of market share resulting from the racketeering activity.  See, e.g., Callahan, 182 F.3d at 264 (holding that a competitor of a racketeering organization could not maintain a RICO claim for loss of market share because the competitor's damages were likely the result of legitimate competitive tactics as well as the racketeering activity); see also Anza, 547 U.S. at 457-60 (finding that a competitor of a company who committed tax fraud, which enabled the company to lower its prices, could not maintain a RICO claim because the defendant company's ability to lower prices could not be attributed solely to its racketeering activity).

The present case is distinguishable from those cited by Chase.  In Callahan and Anza, the plaintiffs allegedly suffered harm as a result of the aftershocks of transactions to which they were not parties.  They had no direct dealings with the RICO enterprise.  Their damages were attributable both to their own competitive inefficiency and the secondary effects that their competitor's racketeering had on the market for the plaintiffs' products.  Here, however, plaintiffs are direct consumers, not remote competitors, of the defendants.  Their injuries derive exclusively from personal contact with the Percudani defendants' mortgage enterprise.  Unlike the plaintiffs in Callahan and Anza, plaintiffs presently before the court did not engage in extraneous actions from which their injuries may have resulted.  Thus, Callahan and Anza do not foreclose liability in the instant case.

summary judgment burden to demonstrate that Chase conspired to assist a racketeering enterprise that directly caused their harm.

The second proximate causation factor requires that apportionment of damages among plaintiffs be relatively straightforward. Over one hundred plaintiffs have joined the present actions; however, apportionment of damages would entail no speculation. Plaintiffs have provided expert evidence calculating the value by which their purchase prices exceeded prevailing market rates. Based on this evidence, the amount of each plaintiff's damages would be easily calculable.

Finally, the third factor requires that no alternative plaintiffs be better suited to vindicate the alleged wrongs. The Chase defendants argue that the entities to which they sold plaintiffs' mortgage paper are better able to serve as RICO plaintiffs because they have purchased mortgages that plaintiffs are unable to repay. The Chase defendants also contend that an investigation by the Pennsylvania Attorney General indicates that an alterative means of enforcement is available.

Chase's contentions are unpersuasive. Reliance on secondary purchasers to litigate RICO claims may provide compensation for *the secondary purchasers'* damages, but such litigation would do nothing to compensate *plaintiffs*, who have incurred debt in excess of the fair market value of their homes. Reliance on state authorities for enforcement is similarly unavailing. Government investigations may result in penalties, but they are ill-equipped to compensate plaintiffs for their damages. Few, if any, enforcement mechanisms outside of the present case would allow plaintiffs the opportunity to proffer their own valuation evidence and receive

direct recovery for the monetary harms they have allegedly suffered.  An award of

attorneys' fee to which prevailing RICO plaintiffs are entitled further strengthens

the propriety of plaintiffs' status in the pending litigation, as any such award would

provide plaintiffs with monetary relief as well as the costs of pursuing it.

Accordingly, the court concludes that no potential plaintiffs exist who are better

situated to vindicate the rights asserted in this case.  The court finds that plaintiffs

have produced sufficient evidence to permit a reasonable jury to conclude that the

Chase defendants participated in a conspiracy with Stranieri and the Percudani

defendants to sell homes at prices in excess of market value.[20]

## IV.   **Conclusion**

In the context of the pending Rule 56 motions, plaintiffs have proffered

evidence that the Percudani defendants participated in a racketeering enterprise

that utilized a mail fraud scheme to market and sell homes at prices in excess of fair

market values.  They have also proffered sufficient evidence that they suffered

---

[20]Plaintiffs have filed two motions to strike documents submitted by the Percudani defendants.  (See Docs. 355, 357.)  The first motion (Doc. 355) requests that the court strike the counter-affidavits (Doc. 348) of Raintree's comptroller and defendants' counsel.  Defendants filed this affidavit in response to a prior affidavit of plaintiffs' counsel, which was submitted under Rule 56(f) of the Federal Rules of Civil Procedure.  Rule 56(f) permits a party opposing a motion for summary judgment to "show[] by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition."  See FED. R. CIV. P. 56(f).  The court may take various actions on the motion for summary judgment upon such a showing.  Id.

Plaintiffs' affidavit describes the Percudani defendants' purported failures to comply with discovery requests regarding the down payments of plaintiffs who purchased homes through refinance transactions such as those described at note 13, supra.  The affidavit states that plaintiffs are unable to fashion a comprehensive response to defendant's motion by virtue of these failings.  (See Doc. 354 at 2-3.)  The Percudani defendants' affidavit responds to plaintiffs' contentions.  (See Doc. 348 at 1-4 & Ex. A.)  The court has reviewed the contents of both the Rule 56(f) affidavit and the counter-affidavits.  The court finds that the discovery dispute contained therein has an inconsequential effect on the disposition of the Percudani defendants' motion, which seeks dismissal based on upon a failure of proximate causation unrelated to the amount of the down payment involved in any particular transaction.  Plaintiffs' first motion (Doc. 355) to strike will therefore be denied as moot.

Plaintiffs' second motion (Doc. 357) seeks to strike the Percudani defendants' response (Doc. 349) to plaintiff's counterstatement of material facts.  Neither Rule 56 of the Federal Rules of Civil Procedure nor Local Rule 56.1 authorizes the filing of such a document, and defendants did not seek leave of court for this filing.  Accordingly, plaintiffs' motion (Doc. 357) to strike will be granted because the reply statement of material facts (Doc. 349) does not conform with procedural rules.

direct harm as a result of this scheme in the form of inflated home prices.

Similarly, a reasonable jury could conclude that the Chase defendants enabled the

scheme by providing financing through channels that deviated from established

lending practice.  Accordingly, the motions for summary judgment will be denied.

An appropriate order follows.


  S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge


Dated:        March 21, 2008

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**


| | | |
|---|---|---|
| **EDDIE LESTER**, *et al.*, | : | **CIVIL ACTION NO. 3:01-CV-1182** |
| | : | |
| **Plaintiffs** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **GENE P. PERCUDANI, CHASE** | : | |
| **MANHATTAN MORTGAGE** | : | |
| **CORPORATION, CHAPEL CREEK** | : | |
| **HOMES, INC., RAINTREE** | : | |
| **HOMES, INC., CHAPEL CREEK** | : | |
| **MORTGAGE BANKER, INC.,** | : | |
| **DOMINICK P. STRANIERI, and** | : | |
| **WILLIAM SPANER,** | : | |
| | : | |
| **Defendants** | : | |

------------------------------------------------------------------------

| | | |
|---|---|---|
| **PABLO ACRE**, *et al.*, | : | **CIVIL ACTION NO. 1:04-CV-0832** |
| | : | |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CHASE MANHATTAN MORTGAGE** | : | |
| **CORP., WILLIAM K. SPANER,** | : | |
| **DOMINICK P. STRANIERI, GENE** | : | |
| **PERCUDANI, CHAPEL CREEK** | : | |
| **HOMES, INC., RAINTREE** | : | |
| **HOMES, INC., HOMES BY** | : | |
| **VINTAGE, INC., Y-RENT, INC.,** | : | |
| **and CHAPEL CREEK MORTGAGE** | : | |
| **BANKER, INC.,** | : | |
| | : | |
| **Defendants** | : | |

## <u>ORDER</u>

AND NOW, this 21st day of March, 2008, upon consideration of the motions

for summary judgment (Civil Action No. 3:01-CV-1182, Docs. 306, 360; Civil Action

No. 1:04-CV-0832, Docs. 107, 232), and of the motions to strike (Civil Action No. 3:01-CV-1182, Docs. 355, 357; Civil Action No. 1:04-CV-0832, Docs. 219, 228), it is hereby

ORDERED that:

1.    The motion for summary judgment (Civil Action No. 3:01-CV-1182, Doc. 306; Civil Action No. 1:04-CV-0832, Doc. 107) of defendants Gene Percudani, Chapel Creek Homes, Raintree Homes, Homes by Vintage, Y-Rent, and Chapel Creek Mortgage Banker (hereinafter "the Percudani defendants") is DENIED.

2.    The motion for summary judgment (Civil Action No. 3:01-CV-1182, Doc. 360; Civil Action No. 1:04-CV-0832, Doc. 232) of defendants Chase Manhattan Mortgage Corporation and William Spaner is DENIED.

3.    Plaintiffs' motion to strike (Civil Action No. 3:01-CV-1182, Doc. 355; Civil Action No. 1:04-CV-0832, Doc. 221) the Percudani defendants' affidavit (Civil Action No. 3:01-CV-1182, Doc. 348; Civil Action No. 1:04-CV-0832, Doc. 219) in support of their motion for summary judgment is DENIED as moot.

4.    Plaintiffs' motion to strike (Civil Action No. 3:01-CV-1182, Doc. 357; Civil Action No. 1:04-CV-0832, Doc. 228) the Percudani defendants' response to plaintiffs' counterstatement of material (Civil Action No. 3:01-CV-1182, Doc. 349; Civil Action No. 1:04-CV-0832, Doc. 222) facts is GRANTED.

5.    A revised pretrial and trial schedule shall issue upon disposition of the motion for reconsideration pending in the civil action docketed at No. 3:01-CV-1182.


   S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge